UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


LORI BLACK,

      Plaintiff,

v.                                                      4:11cv539-WS

ADVANCED NEUROMODULATION
SYSTEMS, INC.,

      Defendant.

_____


ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

      Lori Black sues her former employer, Advanced Neuromodulation Systems, Inc. ("ANS"), asserting claims for defamation (Count I), fraud in the inducement (Count II), tortious interference with a contractual relationship (Count III), fraud (Count IV), and fraudulent misrepresentation (Count V).  Before the court at this time is ANS's motion for summary judgment.  Doc. 116.  Black has responded (doc. 133) in opposition to the motion, and the parties have been advised (doc. 175) that the motion would be taken under advisement as of a date certain.

## I.

ANS is a medical technology company that develops, manufactures, and markets neurostimulation devices.  Used to treat chronic neuropathic pain, these devices consist of three components: a generator (also called a stimulator), leads, and a programmer.  The generator delivers electrical impulses to the patient's spine through leads, which are thin wires placed in the epidural space along the patient's spinal column.  The programmer is an external device that allows patients to adjust the strength and location of the stimulation.  The electrical impulses are designed to block pain signals before they reach the patient's brain.

If a physician or pain management specialist determines that a patient is a candidate for neurostimulation, the patient first undergoes a temporary evaluation or "trial" period.  For this trial period, a physician places temporary leads into the epidural space alongside the patient's spinal column.  The temporary leads extend outside the patient's body, are secured by sutures or tape to the patient's body, and are controlled by an external generator that typically connects to a belt around the patient's waist.  At the end of the trial period, usually lasting three to seven days, the temporary leads are removed from the patient's spine.

If, after the trial period, the patient and physician agree that the ANS device was effective in masking the patient's pain, the patient is scheduled for

implantation of a permanent neurostimulation system.  During the permanent

implant procedure, a surgeon implants both an internal generator (similar to a

pacemaker) into the patient's back as well as permanent leads along the patient's

spinal column.

Both the temporary evaluation and permanent implant procedures are

surgical procedures that must be conducted by a physician.  However, according to

David Swink, ANS's Southeast Area Vice President of Sales, a physician may

authorize a member of his or her own medical staff to remove temporary leads

from a patient's spine.

ANS employs Territory Managers to market and sell its neurostimulation

devices to physicians and hospitals in specific geographic regions around the

world.  ANS employs Clinical Specialists to provide product support before,

during, and after the implanting of a neurostimulation device.  Among other things,

Clinical Specialists are responsible for answering any questions that a physician or

patient may have about the system, for programming the neurostimulation system

once it has been implanted by the physician, and for educating the patient

regarding the proper use of the handheld programmer.  Clinical Specialists are

present for most procedures involving the implantation of an ANS medical device.

At all times relevant to this case, ANS's primary competitors in the neuromodulation field were Boston Scientific, Inc. ("BSX"), and Medtronic, Inc. ("MDT").  All three companies market their respective neurostimulation systems in Tallahassee, Florida.

The neurostimulation device industry is regulated by a number of state and federal statutes, including the federal anti-kickback statute.  Moreover, most neurostimulation companies—including ANS, BSX, and MDT—have adopted the code of ethics published by the Advanced Medical Technology Association ("AdvaMed").  Indeed, ANS, BSX, and MDT participated in the drafting of the AdvaMed Code.

The AdvaMed Code is the product of industry collaboration and is intended to facilitate ethical interactions between medical technology companies and health care professionals.  To that end, the AdvaMed Code "strongly encourage[s]" medical technology companies to implement effective compliance programs by—among other things—"designating a compliance officer and compliance committee" and "developing effective lines of communication," including "an anonymous hotline to facilitate reporting of possible violations of the Code."

The AdvaMed Code of Ethics addresses a variety of issues.  In particular, the Code provides that a medical technology company may provide "accurate and

objective information designed to offer technical or other support intended to aid in

the appropriate and efficient use or installation of the Company's Medical

Technologies."  On the other hand, the Code provides that

> [a] company may not . . . provide coverage, reimbursement and health
> economics support as an unlawful inducement.  For example, a
> Company should not provide free services that eliminate an overhead
> or other expense that a Health Care Professional would otherwise of
> business prudence or necessity have incurred as part of its business
> operations if doing so would amount to an unlawful inducement.

To facilitate compliance with the AdvaMed Code, legal counsel for ANS,

BSX, and MDT have developed a collegial reporting relationship through which

they informally voice concerns to one another regarding possible violations of the

applicable laws, regulations, and the AdvaMed Code.  As General Counsel for

ANS, Kimberley Elting has at times contacted Tracy Schubert, BSX's Chief

Corporate Counsel, and John Eisenberg, legal counsel for MDT, to report concerns

regarding activities of BSX and MDT employees respectively.  Schubert and

Eisenberg have likewise contacted Elting at times to report their concerns with

respect to ANS employees.  Counsel report concerns to one another with the

expectation that the company receiving the report will investigate the allegations

and remedy a violation, if established.  Counsel for both ANS and BSX have

asserted that, given the AdvaMed Code, they have a mutual interest in reporting

and receiving information relating to the job performance of their neuromodulation

employees.

In December of 2007, Lori Black, a registered nurse, was hired by BSX as a Clinical Specialist in the Tallahassee market area.  An at-will employee, Black signed a non-compete agreement precluding her from working for a neuromodulation competitor for one year following the termination of her employment with BSX.

As a Clinical Specialist for BSX, Black was usually present in the OR when physicians conducted temporary and permanent implant procedures in her assigned territory. While in the OR, Black was "expected to basically stand back and stand out of the way and not interfere with anything that was going on or—just let the staff do what they needed to do until it was time for the doctor to use [the BSX] equipment."  Once the physician was ready to implant the generator and/or leads, Black was responsible for providing technical support to the physician, answering questions regarding the equipment, and programming the equipment via remote control.  She was trained not to compromise the sterile field during the procedure, and she was instructed not to remove leads or assist in the removal of leads.

Dr. George Arcos, a pain management physician, was BSX's largest account in the Tallahassee area during Black's tenure as a BSX Clinical Specialist.  Black was typically in Dr. Arcos's office three days a week programming stimulators for

Dr. Arcos's patients.

In 2010, David Wimberly was an ANS Territory Manager assigned to the Tallahassee market.  As a frontline sales person for ANS, Wimberly occasionally visited Dr. Arcos's office.  Through his observations and conversations with Dr. Arcos's wife/practice manager, Wimberly concluded that it was Dr. Arcos's "standard" practice to have neurostimulator clinical specialists remove leads from patients.  Although he never observed Black remove a lead from a patient, Wimberly assumed that she did so based on his conclusion regarding Dr. Arcos's practice.  Concerned that Black was able to do things for Dr. Arcos that ANS prohibited its clinical specialists from doing,[1] Wimberly reported his concerns to ANS's North Florida Regional Sales Director, Larry Parker.  In addition to reporting that Black may have been pulling leads from patients' spines, Wimberly reported that Black removed her BSX name badge before entering Dr. Arcos's OR and took patients' histories, actions that Wimberly considered inappropriate for a clinical specialist.

Like Wimberly, Larry Parker occasionally observed Black in Dr. Arcos's office.  On one such occasion, when the door to the OR swung open, Parker saw

---

[1]  Whether RNs or not, ANS representatives are prohibited from assisting physicians with any procedures, including the insertion or removal of leads to or from a patient's spine.

Black—with gloved hands and no BSX name tag—standing across the operating

table from Dr. Arcos, "handing things back and forth across the sterile field."  It

appeared to Parker that Black was servicing Dr. Arcos's offices as a nurse rather

than a BSX representative and that her actions constituted a possible infringement

of the AdvaMed Code.

Based on Wimberly's report and his own observations, Parker believed that

Black's conduct gave BSX an unfair competitive advantage.  He accordingly

reported his concerns to his ANS supervisor, David Swink, Vice President of Sales

for the Southeast Region.  After consulting with Swink, Parker called Kim Elting,

ANS's General Counsel, to report his concerns about Black's conduct.  On

September 9, 2010, believing that Black's conduct, if true, "implicated a possible

violation of the AdvaMed Code," Elting opted to report the information to her

counterpart at BSX, Tracey Schubert, Chief Corporate Counsel to BSX's

neuromodulation division.  Elting did not share the information with anyone except

Schubert, and Schubert in turn did not share the information with anyone outside

of BSX.  BSX thereafter initiated an investigation into Black's conduct.

Although neither Elting nor Schubert now recalls precisely what was said by

Elting to Schubert, BSX's Confidential BSX Investigation Report noted that ANS's

internal legal counsel reported to BSX's internal legal counsel that Black "goes into

Dr. George Arcos' account . . . and takes off her BS[X] name tag and pulls leads and assists Arcos in pulling leads as if she's working for Arcos [] . . . [and] screens patients for Arcos."

Black admits that, while working in Dr. Arcos's OR, she removed her BSX name tag, wore gloves, and donned scrubs provided by Dr. Arcos's office. Moreover, she admits that Dr. Arcos "passed OR cables" to her during trial procedures and passed trial stimulators and generators to her after a trial procedure was completed.  During the course of the BSX investigation, Black further admitted that she assisted Arcos "in securing leads, applying and removing surgical gauze (tape) from patients, [and] holding patient's hands during procedures." Black denies, however, that she ever "pulled leads" for Dr. Arcos, although she concedes that, in 2008, she pulled leads from a patient's spine when she was working as a BSX Clinical Specialist in Georgia.

In a sworn statement, Dr. Arcos stated as follows:

Generally Ms. Black was present within the OR, but not the sterile field of the surgical procedure.  At no time did I see Ms. Black violate any clearly established sterile techniques while in my operating suite. I advised Ms. Black that the name-tag identifying her as a Boston Scientific representative . . . should either be removed while in the OR suite or should be covered by sterile scrubs provided to her by my office.

Additionally, at no time did Ms. Black "pull test leads" which I had implanted in a patient.  Mr. Black routinely and at my request would

assist me in removing such leads.  Further, it was my practice to
suture test leads to secure such leads during the trial period.  I
personally removed the sutures securing such test leads with the
assistance of Ms. Black which was consistent with her scope of
practice as an RN.  At no time did Ms. Black alone in a treatment
room remove test leads from my patients.

While Black and Dr. Arcos both deny that Black pulled leads from patients'

spines, Travis Brock (Black's BSX Territory Manager for several months in 2010)

testified that he personally observed Black pulling leads in Dr. Arcos's office "[a]t

least once—maybe five times."  James Daniels, RN, Dr. Arcos's former Director of

Clinical Operations, testified that Dr. Arcos "very rarely" pulled leads.  Although

Daniels never actually observed Black pulling leads, he explained that after he put

patients with attached leads into a room attended only by Black, the patients would

later exit the room with leads removed.  Daniels thus concluded that Black must

have pulled leads from patients' spines.

Approximately a week after Elting reported her concerns about Black to

Schubert, a federal district court in Utah invalidated the BSX non-compete

agreement.  Boston Scientific Corp. v. Mabey, No. 2:10cv467-CW, 2010 WL

3661020 (D. Utah 2010).[2]  Thinking that the Utah court's decision opened the door

for ANS to recruit BSX employees, Larry Parker and David Swink thereafter

_____

[2]  The district court's decision was appealed and ultimately reversed on
October 31, 2011, by the Court of Appeals for the Tenth Circuit.

contacted a number of BSX employees, including Black, to gauge their interest in

working for ANS.

In mid-October 2010, Parker called Black and asked if she would be

interested in speaking to David Swink regarding possible employment with ANS.

Before contacting Black, Parker and Swink discussed their prior concerns about

Black but agreed that they could retrain her to comply with ANS's requirements.

Parker and Swink were then unaware that BSX had opened its own investigation

into Black's conduct on September 22, 2010.  Indeed, neither Parker nor Swink

was even told that Elting had relayed their concerns about Black to BSX.

Black having responded affirmatively to Parker's call, ANS flew Black to

Charlotte, North Carolina, in early November 2010 to meet with Swink about

employment opportunities with ANS.  During their meeting in the Charlotte

airport, Swink learned for the first time *from Black herself* that BSX was

conducting an investigation into Black's conduct.  Based upon Black's description

of what the investigation entailed, Swink deduced that BSX was investigating the

concerns that Parker had earlier shared with Kim Elting.  Swink then revealed to

Black that the complaint which triggered the investigation came from ANS.

After her meeting with Swink, Black informed the BSX investigator, Diane

Thomas, that ANS was the source of the reported concerns about her conduct.

Thomas's entry regarding her November 11, 2010, interview of Black reflects that:

> [Swink] was trying to recruit Black. [Swink] and Black met at the
> airport and discussed her nursing background.  Black told [Swink]
> that [BSX] did business with Dr. Arcos. [Swink] said "you need to
> know we [ANS] are the ones that called in a complaint to
> [BSX]"about Arcos and Black because "we had reason to believe you
> were doing unethical things to get the business with Arcos. [Swink]
> said he hoped [ANS's] complaint did not "derail" their efforts to
> recruit Black.

Despite knowing that the BSX investigation into her conduct was triggered

by an ANS report, Black actively pursued an offer of employment from ANS,

negotiated the terms of the offer, and—on November 12, 2010—executed her

acceptance of a  Territory Manager position with ANS—a promotion from the

position she held at BSX.  Black later "negotiated a better deal" from ANS and

executed a more favorable offer letter on November 29, 2010.  Both offer letters

provided as follows:

> Your employment is at-will and [ANS] does not guarantee your
> employment for any specific period of time.  This means there is no
> written or unwritten agreement of employment between you and
> [ANS], except as set forth in the Non-compete Agreement.  Both you
> and [ANS] have the choice of ending your employment at any time,
> for any reason, with or without notice.

Before drafting a resignation letter to BSX on November 29, 2010, Black

informed her direct supervisor, Will Richter, that she intended to resign from BSX.

Black claims that Richter encouraged her to stay at BSX, suggesting that he could

promote her to a Clinical Specialist 4 position if she continued working for BSX.

Richter has since testified that he never thought about terminating Black's

employment, that Black was his "most experienced, most knowledgeable clinical

specialist," that he never had a reason to question her clinical or ethical conduct,

that she "played a very, very instrumental role with [BSX] in Tallahassee," that,

"without her, [BSX] wouldn't have had half the success that [it] had there," that

"she was the reason that we were able to hold onto the business that we had," and

that she had "very good relationships with . . . pretty much all the neurosurgeons."

Black voluntarily resigned from her job with BSX, effective December 3,

2010.  During her BSX exit interview, Black indicated that she was leaving BSX

because of the "lack of career path/opportunity" and "lack of appreciation."  Black

started working for ANS as a Territory Manager III in the Tallahassee market on

December 6, 2010.  She signed ANS's non-compete agreement on December 7,

2010.  On December 12, 2010, just days after Black's resignation from BSX, Diane

Thomas—BSX's Manager of Compliance and Ethics Investigations—issued her

investigative report, finding that ANS's concerns regarding possible ethical

violations by Black could not be substantiated.

ANS terminated Black's employment on February 18, 2011.  Black's delay in

returning certain equipment to BSX upon her resignation is among the reasons

given by ANS for her termination.  In that regard, Black's contract with ANS

provided:

> [ANS] does not permit employees to use or disclose confidential
> information of a former employer.  We expect you will neither keep
> any documents or property of your previous employer nor bring any
> such items to [ANS].

Elting, moreover, personally stressed to Black the importance of returning all BSX

equipment to BSX before she began her employment with ANS.  In addition,

before Black resigned from BSX, Elting sent Black a "template resignation notice"

with the suggestion that Black use it "to send to Black's manager and BSX HR."

The template contained the following language: "Please let me know where I

should deliver my inventory, laptop and other Boston Scientific property."  Elting

explained:

> Lori Black was employed by a competitor.  My job was to ensure that
> if she took a position with [ANS], that she did so in a way that would
> not jeopardize [ANS].  The primary purpose in providing the template
> was to ensure that she return all of her Boston Scientific materials and
> not bring any to us. . . . The concern whenever hiring an employee of
> a competitor is to ensure that they don't either intentionally or
> unintentionally leave their employment with confidential information
> and bring it to us.

Given her clear instructions to Black, Elting was accordingly surprised to learn

that, as of January 28, 2011, Black was still getting demand letters from BSX for

the return of BSX products worth approximately $10,000.

Other reasons given by ANS for Black's termination include (1) that Black caused "constant issues and disruption," and (2) that Black acted "unprofessionally during a dinner with a Tallahassee surgeon."  The evidence supporting these two reasons is controverted.

Black thereafter filed this suit against ANS, asserting claims for defamation per se, fraud in the inducement, tortious interference with a contractual relationship, fraud, and fraudulent misrepresentation.  Having reviewed the parties' voluminous submissions in support of and in opposition to ANS's motion for summary judgment, the court has determined that ANS is entitled to judgment as a matter of law.

## II.

To establish a claim for defamation per se, Black must demonstrate that (1) ANS published a false statement about Black; (2) the false statement was communicated to a third party; and (3) the communication tended to subject Black to "hatred, distrust, ridicule, contempt, or disgrace," or tended to injure her in her trade or profession, or imputed to her "conduct, characteristics, or a condition incompatible with the proper exercise of [her] lawful business, trade, profession or

office."[3] Perry v. Cosgrove, 464 So. 2d 664, 666 (Fla. 2d DCA 1985); Razner v.

Welllington Reg'l Med. Ctr., Inc., 837 So. 2d 437, 442 (Fla. 4th DCA 2002).

Black contends that ANS made a false report to BSX that tended, among other

things, to injure her in her trade or profession.  Specifically, she points to Elting's

communication to Schubert that Black "goes into Dr. George Arcos' account . . .

and takes off her BS[X] name tag and pulls leads and assists Arcos in pulling leads

as if she is working for Arcos [] and . . . screens patients for Arcos."

   "Where a communication is reasonably susceptible of only one meaning,

then it is for the court to determine as a matter of law whether it is [defamatory] or

not." Owner's Adjustment Bureau, Inc., 402 So. 2d 466, 468 (Fla. 3d DCA 1981).

The court thus has a "prominent function" in determining whether a statement is

defamatory.  Smith v. Cuban American Nat'l Found., 731 So. 2d 702, 704 (Fla. 3d

DCA 1999).

   ANS contends that it is not liable for defamation because the alleged

communication to Schubert from Elting was not false but was, instead,

"substantially true."  Truth, coupled with good motives, is a defense to a

defamation claim.  LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-

ANF, Inc., 842 So.2d 881, 886 (Fla. 4th DCA 2003).  For purposes of a defamation

---

   [3]  Because this is a diversity case, the rule of decision as to each of Black's
claims is provided by state law.  Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).

claim, "a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true."  <u>Smith</u>, 731 So. 2d at 706.  Florida Standard Jury Instruction 405.9 provides that:

> On the defense of truth, the issue for your determination is whether the statement made by [the defendant] was substantially true and was made by [the defendant] with good motives.  A statement is substantially true if its substance or gist conveys essentially the same meaning that the truth would have conveyed.  In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement.  If the greater weight of the evidence supports this defense, your verdict should be for [the defendant].

Here, the court finds that Elting's statements to Schubert were substantially true.  Black has admitted that, on occasion, she removed her BSX name tag and wore scrubs provided by Dr. Arcos when she worked in the doctor's OR, that she assisted Dr. Arcos in pulling leads, and that she obtained "pre-authorization" for neuromodulation procedures for Dr. Arcos's patients.  It is not a stretch to say that it appeared "as if she [were] working for Arcos."  While Black denied that she in fact "pulled leads" for Dr. Arcos, she admitted that she pulled leads for a doctor in Georgia.  Clearly, the "gist" of Elting's communication was "substantially true."

ANS also contends that Elting's remarks to Schubert were privileged as a matter of law.  In Florida, "[a] communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is

privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation." Nodar v. Galbreath, 462 So.2d 803, 809 (Fla. 1984) (internal quotation marks omitted).  Where the circumstances surrounding an alleged defamatory communication are undisputed, the question of "whether the occasion upon which they were spoken was privileged is a question of law to be decided by the court." Id. at 810.  If the speaker can show that his or her statements were uttered in a privileged context, then a presumption of good faith arises.  Id.  To overcome the presumption of good faith, the plaintiff must prove that the defendant's statements were uttered with express malice.  Id.

ANS contends that the privilege applies in this case (1) because Elting's statements were "made for the protection of [BSX's] interest in receiving information on the performance of its employee," id.; and (2) because ANS and BSX had a common business interest in the subject of the statements based on their joint membership in AdvaMed and their mutual interest in compliance with the AdvaMed Code.  The evidence supports ANS's contention.

Both ANS and BSX participated in the drafting of, and thereafter adopted, the AdvaMed Code of Ethics.  The employees of both companies are expected to abide by the Code.  As acknowledged by Elting and Schubert, their respective in-

house counsel, both companies have a mutual interest in reporting and receiving

information relating to the job performance of neuromodulation employees, and

both companies have an interest in ensuring employee compliance with industry

regulations and ethical standards.  Consistent with their mutual interest, the

practice of both companies—as well as others in the industry—has been to share

concerns regarding potential Code violations and to do so in a manner that is

appropriate.  Given such evidence, the court finds that the statements shared by

Elting with Schubert were subject to a qualified privilege.

Because ANS has met its burden of showing that a qualified privilege exists,

the burden falls on Black to show that ANS acted with express malice.  In Nodar,

the Florida Supreme Court explained:

> Where a person speaks upon a privileged occasion, but the speaker is
> motivated more by a desire to harm the person defamed than by a
> purpose to protect the personal or social interest giving rise to the
> privilege, then it can be said that there was express malice and the
> privilege is destroyed.  Strong, angry, or intemperate words do not
> alone show express malice; rather, there must be a showing that the
> speaker used his privileged position "to gratify his malevolence."  If
> the occasion of the communication is privileged because of a proper
> interest to be protected, and the defamer is motivated by a desire to
> protect that interest, he does not forfeit the privilege merely because
> he also in fact feels hostility or ill will toward the plaintiff.  The
> incidental gratification of personal feelings of indignation is not
> sufficient to defeat the privilege where the primary motivation is
> within the scope of the privilege. See

Id. at 811–12 (Fla. 1984).

While Black maintains that ANS, through Elting, acted with express malice, the record does not support a finding of express malice. Black suggests that Elting's communications were part of a nefarious scheme to recruit Black away from BSX, but the record reveals that (1) Black was bound by the terms of BSX's non-compete agreement when Elting made her call to Schubert; (2) the federal court in Utah entered its order invalidating a BSX non-compete agreement *after* Elting's call; and (3) ANS's recruitment of Black was triggered by the Utah court's decision. The evidence thus indicates that Elting's call to Schubert had nothing to do with an attempt by ANS to recruit Black.

Black also contends that statements allegedly made by David Swink and David Wimberly, purportedly acknowledging the "falsity" of ANS's complaint about Black, establish that Elting acted with express malice when she shared ANS's concerns about Black with Schubert. Even if—contrary to the denials of Swink and Wimberly—the court accepts that Swink and Wimberly made the purported statements, knowledge of falsity is insufficient to establish express malice. Id. at 806 (distinguishing between "actual malice," which consists of knowledge of falsity or reckless disregard of truth or falsity, and "express malice," which requires proof of an intention to cause harm rather than proof of knowledge); John Hancock Mut. Life Ins. Co. v. Zalay, 581 So. 2d 178, 180 (Fla.

2d DCA 1991) (noting that "[e]xpress malice cannot be inferred from the mere fact

that the statements were untrue") (internal quotation marks omitted).

In sum, because the court finds that (1) Elting's statements to Schubert were

substantially true, and (2) Black has not rebutted the presumption of good faith

with proof of express malice, ANS is entitled to summary judgment on Black's

defamation claim.

### III.

Black claims that ANS tortiously interfered with her BSX contract.  To

establish a cause of action tortious interference with a contractual relationship,

Black must demonstrate (1) the existence of a contract, (2) ANS's knowledge of

that contractual relationship, (3) ANS's intentional procurement of the contract's

breach, (4) absence of any justification or privilege, and (5) damages resulting

from the breach.  McKinney-Green, Inc. v. Davis, 606 So. 2d 393, 397-98 (Fla. 1st

DCA 1992).

Here, the evidence reveals that BSX did not breach its contract with Black,

took no steps to terminate Black's employment, and, indeed, tried to convince her

to remain with BSX once she disclosed that she was being recruited by ANS.  As

an at-will employee, Black was entitled to—and did—*voluntarily* resign her

clinical-specialist position at BSX, accepting instead a position at ANS as a

territory manager, a position that amounted to a promotion.  Black has no claim for tortious interference with her BSX contract.  See, e.g, Chipley v. Atkinson, 1 So. 934, 942 (Fla. 1887) (stating that, in order to have a cause of action for tortious interference with an employment contract, "[t]here must, we think, always be . . .  a discharge of the plaintiff . . . as amounts to a termination by his employer of the contract with the employee"); Geller v. Von Hagens, No. 8:10–CIV–1688-EAK-AEP, 2010 WL 4867540, at *4 (M.D. Fla. Nov. 23, 2010) (dismissing the plaintiff's claim for tortious interference with his employment agreement where the evidence revealed that the plaintiff voluntarily resigned); Mulligan v. Wallace, 349 So. 2d 745, 747 (Fla. 3d DCA 1977) (finding no cause of action for tortious interference with a contract where the plaintiffs resigned from their positions); Lingard v. Kiraly, 110 so. 2d 715, 717 (Fla. 3d DCA 1959) (same).

IV.

In her second amended complaint, Black asserts claims for fraud, fraudulent misrepresentation, and fraudulent interference.  The allegations in that amended complaint reveal that all of Black's fraud-based claims are based upon alleged misrepresentations and/or omissions regarding the BSX investigation and an "anonymous complaint" that purportedly caused her to resign from BSX.  She alleges, for example, that (1) "[t]he anonymous Complaint [filed with her then

employer, BSX] contained exclusively false and malicious allegations," doc. 180, ¶ 6; (2) "it was [ANS's] plan to make the false allegations against the Plaintiff in an effort to force the Plaintiff's departure from her employment with [BSX]," id. ¶ 11; (3) ANS "fraudulently induced the Plaintiff to leave her employment with [BSX], knowing that its anonymous Complaint containing the false and malicious allegations had caused [BSX] to conduct the internal investigation concerning the Plaintiff," id.; (4) "by filing its anonymous Complaint with [BSX], [ANS] made deliberate and knowing misrepresentations that were designed to cause [BSX], and did actually cause [BSX] to cnduct an internal investigation which threatened the Plaintiff's employment with [BSX]," id. at ¶ 24.  She includes no allegations in her original, first, or second amended complaints regarding any misrepresentations that ANS made during what Black now refers to as the "back end" of the case—i.e. after Black left BSX and went to work for ANS.

To establish her claims for fraud, fraudulent misrepresentation, and fraudulent interference, Black must prove "(1) a false statement of material fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage or injury."  Nat'l Ventures, Inc. v. Water Glades 300 Condo. Ass'n, 847 So.

2d 1070, 1074 (Fla. 4th DCA 2003); Grills v. Philip Morris USA, Inc., 645 F.

Supp. 2d 1107, 1122 (M.D.Fla. 2009) (noting that, in Florida, "[c]auses of action

for fraud, fraudulent misrepresentation, fraudulent inducement and fraudulent

concealment have identical elements").  ANS contends that Black cannot establish

any of her fraud claims because, among other things, she cannot establish that any

of the "front end" representations—those made by Elting to Schubert and those

involving the BSX investigation—were materially false.  ANS has produced ample

evidence to support its contention.

      In response, Black now suggests that her fraud claims are based upon: (1)

Elting's allegedly false statement regarding the scope of the Utah court's opinion in

Boston Scientific Corp. v. Mabey , including Elting's failure to advise Black that

the Utah district court's decision in Mabey was on appeal and that the case "was

limited by its specific facts and application to one jurisdiction;" (2) ANS's decision

to secretly approach her doctor clients after she was hired and in training; (3)

ANS's decision to terminate Black for "false pretextual" reasons only 67 days after

she was hired; and (4) her pretextual firing "knowing that based upon the ANS

non-compete agreement she was no longer a player in the neuromodulation market

place."  All of these alleged facts—or theories—were not included in any of her

complaints and cannot now serve as a basis for avoiding summary judgment.

GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) (noting that "[i]t is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings").

## V.

This Court may grant summary judgment if, viewing the evidence in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (noting that a dispute gives rise to a genuine issue of material fact when the evidence permits a reasonable jury to return a verdict in favor of the nonmoving party).  Here, the court finds that, in response to ANS's properly-supported motion for summary judgment, Black has failed to raise genuine issues of material fact as to any of her claims.  Because a reasonable jury, viewing the evidence in the light most favorable to Black, could not render a verdict in Black's favor on her claims, ANS is entitled to judgment as a matter of law.

Accordingly, it is ORDERED:

1.  ANS's motion for summary judgment (doc. 116) is GRANTED.

2.  ANS's request for oral argument (doc. 143) is DENIED.

3.  The clerk shall enter judgment stating: "Judgment is entered in favor of the defendant and against the plaintiff on all claims."

4.  Costs shall be taxed against the plaintiff.

DONE AND ORDERED this ___27th___ day of ___March___, 2014.



s/ William Stafford
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE